UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

SINCERE SMITH,

                              Plaintiff,

v.                                                    9:20-CV-1435
                                                    (GTS/CFH)

C.O. B. HUGGLER; and C.O. K. BROOKS,

                              Defendants.
_____

APPEARANCES:                                        OF COUNSEL:

SMITH HOKE, PLLC                         MEREDITH A. MORIARTY, ESQ.
   *Pro Bono* Trial Counsel for Plaintiff
16 Wade Road
Latham, NY 12110

HON. LETITIA A. JAMES                   JENNIFER J. CORCORAN, ESQ.
Attorney General for the State of New York    Assistant Attorney General
   Counsel for Defendants
The Capitol
Albany, NY 12224

GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

      The trial in this prisoner civil rights action, arising from an incident that occurred at Great Meadow Correctional Facility ("Great Meadow C.F.") on October 4, 2020, began with an evidentiary hearing before the undersigned on July 20, 2023, regarding the affirmative defense of Corrections Officers B. Huggler and K. Brooks ("Defendants") that, before filing this action *pro se* on October 21, 2020, Sincere Smith ("Plaintiff") had failed to exhaust his available administrative remedies, as required by the Prison Litigation Reform Act. (Dkt. No. 2, at 2, ¶ II.C. [Plf.'s Compl., alleging date of underlying incident]; Dkt. No. 2, at 17 [Envelope of Plf.'s

1

Compl., bearing postmark dated Oct. 21, 2020]; Dkt. No. 45, at ¶ 18 [Defs.' Answer to Am. Compl., asserting failure to exhaust as affirmative defense].)[1]   At the hearing, documentary

---

[1]   The Court notes that, although Plaintiff's Complaint was received and docketed by the Clerk's Office on Friday, October 23, 2020 (Dkt. No. 2, at 1), and purportedly verified by Plaintiff on Thursday, October 22, 2020 (Dkt. No. 2, at 16), the envelope in which it was mailed bears a postmark date of Wednesday, October 21, 2020 (Dkt. No. 2, at 17; Hrg. Tr. at 87 [containing the relevant hearing testimony of Plaintiff]).   An inmate's papers are deemed "filed" at the moment the inmate "delivered [them] to the prison authorities for forwarding to the court clerk." *Houston v. Lack*, 487 U.S. 266, 276 (1988).   This rule has become known as the "Prison Mailbox Rule," and has been applied to inmates filing complaints.   *See, e.g., Noble v. Kelly*, 246 F.3d 93, 97-98 (2d Cir. 2001); *Dory v. Ryan*, 999 F.2d 679, 682 (2d Cir. 1993), *modified on other grounds*, 25 F.3d 81 (2d Cir. 1994).   Although generally this date of delivery is presumed to be the date on which the papers were signed, this presumption may be rebutted by "contrary evidence."   *See Hardy v. Conway*, 162 F. App'x 61, 62 (2d Cir. 2006) (summary order) ("[I]n the absence of contrary evidence, district courts in this circuit have tended to assume that prisoners' papers were given to prison officials on the date of their signing.").   Such contrary evidence may include, for example, evidence appearing on the face of the mailing envelope, such as the return address and/or the postmark date. *See, e.g., Inesti v. Hagan*, 11-CV-2596, 2012 WL 3822224, at *4 (S.D.N.Y. Sept. 4, 2020) (relying on postmark date on envelope); *Fabrizio v. Annucci*, 18-CV-0339, 2019 WL 3351643, at 7 (N.D.N.Y. June 27, 2019) (Peebles, M.J.) (citing the portion of record containing envelope), *adopted*, 2019 WL 5287959 (N.D.N.Y. Oct. 18, 2019) (Suddaby, C.J.).   Here, the Court finds that the postmark date constitutes such contrary evidence, because it is temporally impossible that Plaintiff could have verified his Complaint the day *after* prison authorities had postmarked the envelope in which he had delivered that Complaint to them for mailing.   (*Compare* Dkt. No. 2, at 16 *with* Dkt. No. 2, at 17.)   Finally, the Court notes that, although Plaintiff suggests that it is *possible* that he placed the Complaint in this action in an envelope on his cell door early on the morning of October 21, 2020 (as opposed to after mail pick up on October 20, 2020), he does not swear that he did so.   (Hrg. Tr. at 94 [containing Plaintiff's hearing testimony stating, "Unless I was up that morning"].)   In any event, he could not have completed his "deliver[y]" of his Complaint to prison authorities for mailing (for purposes of the Prison Mailbox Rule) until a corrections officer had *collected* the Complaint for transportation to the facility's Correspondence Office for mailing (which here was Wednesday, October 21, 2020, the date on which the envelope was postmarked by the Correspondence Office).   (Hrg. Tr. at 63-64 [containing the relevant hearing testimony of Mark Maroney].)   *See, e.g., Torres v. Elcore*, 05-CV-0898, 2006 WL 3536272, at *4 (W.D.N.Y. Dec. 7, 2006) ("A *pro se* prisoner litigant's papers are deemed to have been filed when they are *placed in the hands of* prison officials for mailing . . . .") (emphasis added; citations omitted); *cf.* Fed. R. App. P. 4(c)(1) ("If an inmate [confined in an institution] files a notice of appeal in either a civil or a criminal case, the notice is timely if it is *deposited* in the institution's internal mail system on or before the last day for filing.") (emphasis added); Fed. R. App. P. 25(a)(2)(A)(iii) ("A paper not filed electronically by an inmate is timely if it is *deposited* in the institution's internal mail system on or before the last day for filing . . . .") (emphasis added).

evidence was admitted, and testimony was taken of Plaintiff as well as Defendants' four witnesses whom Plaintiff was able to cross-examine through *pro bono* trial counsel: (1) Great Meadow C.F. Administrative Assistant Lisa Bancroft, (2) Department of Corrections and Community Supervision ("DOCCS") Incarcerated Grievance Program Director Rachael Seguin, (3) Great Meadow C.F. Incarcerated Grievance Program Supervisor Alexandria Cutler, and (4) ) Great Meadow C.F. Lieutenant Mark Maroney.   At the conclusion of the hearing, the undersigned indicated that (following the Court's receipt of supplemental letter-briefs from the parties) a written decision would follow.   This is that written decision.   For the reasons stated below, Plaintiff's Amended Complaint is dismissed without prejudice because of his failure to exhaust his available administrative remedies before filing this action.

I.   **RELEVANT BACKGROUND**

At approximately 9:00 p.m. on Sunday, October 4, 2020, Plaintiff was in the Recreation Yard at Great Meadow Correctional Facility ("Great Meadow C.F.") when he and 70 to 100 other inmates were ordered to "line up in close quarters."   (Dkt. No. 38, at 3, ¶¶ III.2, III.3, III.12 [Plf.'s Verified Am. Compl.]; *cf.* Dkt. No. 2, at 7, ¶¶ 2-3 [Plf.'s Verified Compl.]; Hrg. Tr. at 4, 71, 83.)

At this time, Defendant Huggler, Defendant Downing and Sgt. John Doe were in the Recreation Yard.   (Dkt. No. 38, at 3, ¶¶ III.3, III.6, III.7 [Plf.'s Verified Am. Compl.]; *cf.* Dkt. No. 2, at 7, ¶¶ 3, 6 [Plf.'s Verified Compl.].)

While being escorted back to the A-Block housing unit, Plaintiff was "slashed from behind by an unknown inmate multiple times."   (Dkt. No. 38, at 3, ¶ III.6 [Plf.'s Verified Am. Compl.]; *cf.* Dkt. No. 2, at 8, ¶ 5 [Plf.'s Verified Compl.]; Hrg. Tr. at 71.)

Plaintiff asserts that, later that night – after being taken to the facility's medical center for

3

treatment and then taken straight to the facility's Special Housing Unit (where he was issued clothing and supplies) – he wrote a grievance complaining of the "disregard for social distancing," the fact that "the cameras [were] not on in the yard to identify the attackers," the fact that "metal detectors [were] not detecting the weapons constantly used on victims in the yard," and the fact that "security is not being maintained in the facility . . . ." (Dkt. No. 2, at 11 ["Exhibit A" to Plf.'s Verified Compl., attaching a copy of the purported grievance]; Dkt. No. 27, at 9, ¶ 4 [Plf.'s Decl. in Opp. to Defs.' MSJ]; *cf.* Dkt. No. 2, at 4, ¶ IV.F.1 [Plf.'s Verified Compl.]; Hrg. Tr. at 76-77, 83, 84, 91.)

Plaintiff further asserts that he "submitted his grievance complaint on the 4th of October 2020 by placing it [in an envelope] on the door [of his cell] for officer [sic] who was working to take his grievance and place it in the institutional mail box." (Dkt. No. 27, at 9, ¶ 4 [Plf.'s Decl. in Opp. to Defs.' MSJ]; Hrg. Tr. at 77, 91.) When he woke up the next morning (on Monday, October 5, 2020), asserts Plaintiff, the envelope containing the grievance was gone. (Hrg. Tr. at 78, 83.)

However, subsequently, Plaintiff never received a response from the Great Meadow C.F. Inmate Grievance Resolution Committee ("I.G.R.C.") to that purported grievance. (Dkt. No. 27, at 10, ¶ 5 [Plf.'s Decl. in Opp. to Defs.' MSJ]; *cf.* Dkt. No. 2, at 7, ¶¶ IV.E.2, IV.F.1 [Plf.'s Verified Compl.]; Hrg. Tr. at 79, 83-84.)

As a result, Plaintiff asserts that, on Monday, October 19, 2020, he wrote and dated a letter addressed "To Superintendent[,]" which enclosed a carbon copy of the above-referenced grievance, stated that it had not been "officially filed with the . . . I.G.R.C.," and stated that "[t]his is my attempt to unofficially appeal my grievance . . . ." (Dkt. No. 2, at 12 ["Exhibit B" to Plf.'s Verified Compl., attaching a copy of the purported letter to the Superintendent]; Dkt.

No. 27, at 10, ¶ 5 [Plf.'s Decl. in Opp. to Defs.' MSJ]; *cf.* Dkt. No. 2, at 4, ¶¶ IV.E.3, IV.F.2 [Plf.'s Verified Compl.]; Hrg. Tr. at 79, 85.)

Plaintiff further asserts that, on the same day (Monday, October 19, 2020), he "placed [the letter in an envelope] on the door [of his cell] for it to be [picked up on the morning of Tuesday, October 20, 2020, and] submitted into the institutional mail box for the superintendent . . . ."; however, Plaintiff subsequently received no response to that purported letter. (Dkt. No. 27, at 10, ¶¶ 5-6 [Plf.'s Decl. in Opp. to Defs.' MSJ]; Hrg. Tr. at 80, 85-86, 94; *cf.* Dkt. No. 2, at 4, ¶ IV.F.2 [Plf.'s Verified Compl.].)

On Wednesday, October 21, 2020, Plaintiff filed his Complaint in this action in federal court. *See, supra,* note 1 of this Decision and Order. (*See also* Hrg. Tr. at 86-87, 94.)

## II. GOVERNING LEGAL STANDARD

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e.

The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In this regard, exhaustion serves two main purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Second, exhaustion promotes

efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford*, 548 U.S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

In accordance with the PLRA, the New York State Department of Corrections and Community Supervision ("DOCCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7.[2]

First, an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence.[3] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and

---

[2]   *See also Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *1 & n.1 (N.D.N.Y. March 31, 2010) [citation omitted].

[3]   The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

issues a written decision within a certain number of days of the conclusion of the hearing.

<u>Second</u>, a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal.

<u>Third</u>, a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

These procedural requirements contain several safeguards. For example, if an inmate could not file such a complaint within the required time period after the alleged occurrence, he or she could apply to the facility's IGP Supervisor for an exception to the time limit based on mitigating circumstances. If that application is denied, the inmate can file a complaint

complaining that the application was wrongfully denied.[4]

Moreover, any failure by the IGRC or the superintendent to timely respond to a grievance or first-level appeal, respectively, can be appealed to the next level, including CORC, to complete the grievance process.[5]  However, although an unprocessed grievance (i.e., a grievance that has not been assigned a grievance number) may technically be appealed, an inmate need not appeal that unprocessed grievance because the regulatory scheme advising him of that right is too opaque and confusing.  *See Williams v. Corr. Officer Priatno*, 829 F.3d 118, 126 (2d Cir. 2016) (concluding that "the grievance procedures that were technically available to Williams are so opaque and confusing that they were[] 'practically speaking, incapable of use'" pursuant to
*Ross v. Blake*, 136 S. Ct. 1850, 1859 [2016]).

Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed to exhaust his administrative remedies, and his claims are subject to dismissal.  *Woodford*, 548 U.S. at 93; *Porter*, 534 U.S. at 524; *Ruggiero v. County of Orange*, 467 F.3d 170, 175 (2d Cir. 2006). However, a plaintiff's failure to exhaust does not end the inquiry.   This is because certain exceptions exist to the exhaustion requirement.

---

[4]     *See Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *2 & n.3 (N.D.N.Y. March 31, 2010) (citing *Groves v. Knight*, 05-CV-0183, Decision and Order at 3 [N.D.N.Y. filed Aug. 4, 2009], an appeal from which was subsequently dismissed as frivolous, *see Groves v. Knight*, No. 09-3641, Mandate [2d Cir. filed Jan. 15, 2010].)

[5]     *See* 7 N.Y.C.R.R. § 701.6(g) ("[M]atters not decided within the time limits may be appealed to the next step."); *Murray,* 2010 WL 1235591, at *2 & n.4 [collecting cases]; *cf.* 7 N.Y.C.R.R. § 701.8(g) ("If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC.").

In particularly, in 2004, in *Hemphill v. State of New York*, the Second Circuit held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *Hemphill v. State of New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004), *accord*, *Ruggiero*, 467 F.3d at 175. First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should . . . inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* [citations omitted]. Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id*. [citations and internal quotations omitted].

However, in 2016, in *Ross v. Blake*, the Supreme Court abrogated *Hemphill*'s third prong and effectively enveloped its second prong within its first prong. *Ross v. Blake*, 136 S. Ct. 1850, 1857 (2016). More specifically, under *Ross*, any inquiry that previously would have been considered under the second or third prongs of *Hemphill* is now considered entirely within the context of whether administrative remedies were actually available to the aggrieved inmate. *Ross*, 136 S. Ct. at 1858. This is because, the Supreme Court explained, the PLRA "contains its own, textual exception to mandatory exhaustion." *Id*. In particular, 42 U.S.C. § 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted. *Id*.

9

In the PLRA context, the Supreme Court determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id*. at 1859 (quotation marks omitted).

To guide courts in this new analysis, the Supreme Court has identified three kinds of circumstances in which an administrative remedy, "although officially on the books," is not "available." *Ross*, 136 S. Ct. at 1859. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end– with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Third, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. at 1860.

Finally, two additional points bear mentioning regarding exhaustion hearings. First, the Second Circuit has ruled that a plaintiff in a lawsuit governed by PLRA is not entitled to a jury trial on disputed factual issues relating to his exhaustion of administrative remedies; rather, PLRA exhaustion is a matter of judicial administration. *Messa v. Goord*, 652 F.3d 305, 308-10 (2d Cir. 2011). Second, given that non-exhaustion is an affirmative defense, the defendant bears the burden of providing that a prisoner has failed to exhaust his available administrative remedies.[6] However, once a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then "counter" the defendant's assertion by

---

[6] *Id.* at *4 [citation omitted].

10

persuading the Court of either exhaustion or unavailability.⁷ As a result, practically speaking, while the burden of proving this affirmative defense remains at all times on the defendant, the plaintiff may sometimes have to adduce evidence in order to defeat it.

## III.   ANALYSIS

After carefully considering the matter, the Court finds, based on a preponderance of the credible evidence, that, as a threshold matter, Plaintiff never placed a grievance between the bars of his cell on the night of Sunday, October 4, 2020.⁸ In rendering this finding, the Court relies on the following seven facts: (1) Plaintiff's unconvincing demeanor and body language during his hearing testimony including, but not limited to, his tone of voice, facial expressions, and eye contact (or lack thereof); (2) the fact that, following the alleged underlying incident, Plaintiff chose not to *hand* the purported grievance to the relevant floor Corrections Officer during mail collection (or at least be awake during mail collection);⁹ (3) the credibility of Grievance

---

⁷   *Id.* at *4 & n.17 [citing cases]; *see also Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004) (noting that special circumstances must be "plausibly alleged, . . . justify[ing] the prisoner's failure to comply with administrative procedural requirements"); *Grant v. Kopp*, 17-CV-1224, 2019 WL 368378, at *4 (N.D.N.Y. Jan. 3, 2019) (Peebles, M.J.) ("I conclude that although the burden of proof on this affirmative defense remains with the defendant at all times, the plaintiff can be required to produce evidence in order to defeat it.") (citing cases), *adopted*, 2019 WL 367302 (N.D.N.Y. Jan. 30, 2019) (Sharpe, J.).

⁸   Although the Court does not rely on this fact, the Court notes that four other events would have had to precede Plaintiff's writing of such a grievance between 9:00 p.m. and 12:00 a.m. that night: (1) his transportation to the facility's medical center; (2) his receipt of stitches at that medical center; (3) his transportation to the facility's SHU, and (4) his issuance of clothing and supplies by that SHU.   (Dkt. No. 38, at 4, ¶ 9 [Plf.'s Am. Compl.]; Hrg. Tr. at 76-77 [containing the relevant hearing testimony of Plaintiff].)

⁹   (Hrg. Tr. at 77 [containing the relevant hearing testimony of Plaintiff].) *Cf.* 7 N.Y.C.R.R. 701.7(b) ("Where available, SHU inmates shall use centrally located IGP deposit boxes to send grievance forms and IGP correspondence to the IGP office.").   The Court notes that the plaintiff in *Williams* (the 2016 Second Circuit decision holding than an unprocessed grievance need not be appealed) "gave [his] grievance [directly] to a correction officer . . . ."

11

Program Supervisor Cutler's hearing testimony (which is corroborated by Hearing Exhibit D-12) that, during the time in question, the grievance program at Great Meadow C.F. was functioning, particularly with regard to incarcerated individuals housed in the F Block of the Special Housing Unit or "SHU" at Great Meadow C.F. (where Plaintiff was housed);[10] (4) the credibility of Lieutenant Maroney's hearing testimony regarding the general regularity, timing and secure nature of mail collection in the F Block of the SHU;[11] (5) the lack of any testimony or record evidence that, during the weeks that followed Sunday, October 4, 2020, Plaintiff ever questioned, or complained orally to, any of the individuals who made rounds in the F Block of the SHU (i.e., the floor Captain, floor Lieutenant, Grievance Program Supervisor, or Grievance Program Sergeant) regarding the processing of his purported grievance;[12] (6) the lack of any testimony or record evidence that the members of the floor staff of the F Block of the SHU on Monday, October 5, 2020, included, or even knew of Plaintiff's allegations against, Defendant Huggler, Defendant Brooks, or Sergeant John Doe (who are the three individuals against whom Plaintiff asserted claims in his original Complaint in this action);[13] and (7) the fact that Plaintiff made a

---

*Williams v. Corr. Officer Prianto*, 829 F.3d 118, 120-21 (2d Cir. 2016).

[10]    (Hrg. Tr. at 35, 42, 45-49, 59 [containing the relevant hearing testimony of Alexandria Cutler]; *see also* Hrg. Ex. D-12 [containing IGP Email Reports dated September 2020 through November 2020].)

[11]    (Hrg. Tr. at 60-69 [containing the relevant hearing testimony of Mark Maroney].)

[12]    (*See generally* Hrg. Tr.; Hrg. Exs.)   *Cf.* 7 N.Y.C.R.R. 701.7(c)(1) ("An IGRC staff member (sergeant, officer) or grievance supervisor shall make rounds of all special housing areas at a reasonable time at least once a week to allow inmates direct access to the program.").

[13]    (*See generally* Hrg. Tr.; Hrg. Exs.)   Consequently, the Court has trouble divining any motive by a floor staff member to risk severe discipline by destroying Plaintiff's purported grievance.   (Hrg. Tr. at 67 [containing the relevant hearing testimony of Mark Maroney].)   The Court notes that Plaintiff's purported grievance never expressly identified Defendant Huggler,

material misrepresentation to this Court (whether intentionally or negligently) when he dated his original Complaint in this action.[14]

In any event, even if the Court were to find that Plaintiff had indeed placed a grievance between the bars of his cell on the night of Sunday, October 4, 2020, the Court would still find that Plaintiff failed to exhaust his available administrative remedies under the PLRA before filing this action on Wednesday, October 21, 2020. This is because, during the time in question, the Inmate Grievance Resolution Committee ("IGRC") at Great Meadow C.F. was entitled to 16 calendar days after receiving a grievance in which to resolve it informally. 7 N.Y.C.R.R. § 701.5(b)(1). (*See also* Hrg. Ex. D-1 [containing 2016 version of regulation, which was in effect in 2020]; Hrg. Tr. at 51-52, 57 [containing the relevant hearing testimony of Alexandria Cutler].) If the IGRC could not do so within that time period, it was required to process the grievance (i.e., assign it a grievance number, and enter it into the grievance clerk's log) and conduct a hearing within that time period. 7 N.Y.C.R.R. § 701.5(b)(1),(2). (*See also* Hrg. Ex. D-1; Hrg. Tr. at 24, 42, 51-52, 57 [containing the relevant hearing testimony of Rachael Seguin and Alexandria

---

Defendant Brooks, or Sergeant John Doe. (Hrg. Ex. D-8 [containing a copy of the purported grievance]; Dkt. No. 2, at 11 [attaching "Exhibit A" to Plf.'s Verified Compl., containing a copy of the purported grievance].) *See also, infra,* note 15 to this Decision and Order. Moreover, it never expressly complained of a failure to protect or failure to intervene by any corrections officer. Rather, it complained of only the following: (1) the "disregard for social distancing" (after being "forced by doccs [sic] employees to walk in line in close quarters"); (2) the fact that "the cameras [were] not on in the yard to identify [his] attackers"; (3) the fact that "metal detectors [were] not detecting the weapons constantly used on victims in the yard"; and (4) the fact that "security is not being maintained in the facility . . . ." (Hrg. Ex. D-8; Dkt. No. 2, at 11.)

[14]      *See, supra,* note 1 of this Decision and Order. The Court notes that the misrepresentation was material because it was relevant to, among other things, how many days had elapsed between the submission of Plaintiff's purported grievance (and/or the submission of his letter to the Superintendent) on the one hand and the filing of his original Complaint in this action on the other hand.

Cutler].)[15]   As a result, here, even if Plaintiff had indeed submitted the grievance in question on Monday, October 5, 2020, the IGRC would have had until the *end* of Wednesday, October 21, 2020, by which to process that grievance.   *Id.*[16]   However, Plaintiff did not wait until *after* October 21, 2020, to file his original Complaint in this action; instead, he filed it *on* October 21, 2020.   *See, supra,* note 1 of this Decision and Order.   This failure to wait an additional day to file this action can, and does, serve as an alternative ground on which to find that Plaintiff failed to exhaust his available administrative remedies.   *Cf. Hayes v. Dahlke*, 976 F.3d 259, 270, 271 (2d Cir. 2020) ("Hayes waited only 26 days after the CORC received the appeal of his grievance against the superintendent, *four days short* of the 30-day deadline for the CORC to respond. . . . While Hayes need not wait indefinitely after the agency fails to follow its own deadline at the final stage of appeal, he must actually wait for that deadline to expire before filing suit.") (emphasis added; citation omitted).

   For each of these two independent reasons, the Court dismisses Plaintiff's Amended

---

[15]   The Court notes that a grievance alleging staff misconduct is ordinarily processed the day it is received (so that it can be immediately referred to the Superintendent).   7 N.Y.C.R.R. 701.8(b).   (*See also* Hrg. Tr. at 24 [containing the relevant hearing testimony of Racheal Seguin].)   However, here, the grievance never expressly alleged staff misconduct.   (Hrg. Ex. D-8 [containing a copy the purported grievance, which failed to mention any Corrections Officer by name, or even mention variations of such words as "harass," "fail to protect" or "fail to intervene"].)   *See, supra,* note 13 of this Decision and Order.   This remains true even though the purported grievance stated the date, time and location of the alleged events in question, because those facts could have notified prison authorities of an allegation of staff misconduct only after an *investigation* of the grievance.   (Hrg. Tr. at 30-32 [containing the relevant hearing testimony of Rachael Seguin, testifying, "Oftentimes[,] when we get a grievance alleging staff misconduct, if the individual provides a date or a time or a location, we can use DOCCS records to determine who the staff was assigned to that area at that particular time"].)

[16]   *Cf*. Fed. R. App. P. 6(a)(1)(A) ("When the period is stated in days or a longer unit of time[,] exclude the day of the event that triggers the period [in computing any time period specified in these rules, in any local rule or court order, or in any statute that does not specify a method of computing time]."), *accord*, Fed. R. App. P. 26(a)(1)(A).

Complaint without prejudice.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 38) is **DISMISSED without prejudice** for failure to exhaust his available administrative remedies under the PLRA before filing this action.

The Court certifies that an appeal from this Decision and Order would not be taken in good faith.

Dated: August 9, 2023
       Syracuse, New York

Glenn T. Suddaby
U.S. District Judge